SARAH A. STAFFORD BOYD ET AL V. FROST NATIONAL BANK ET AL.

No. A-630. Decided July 10, 1946.
Rehearing overruled October 23, 1946.
(196 S. W., 2d Series, 497.)

Mr. Justice Slatton, dissenting.

*Powell, Wirtz, Rauhut & Gideon,* of Austin, and *Johnson & Rogers,* of San Antonio, for petitioners.

A general charitable trust, where no charitable objects or class of charities is designated, but the selection is left to the uncontrolled discretion of the trustee, is invalid and unenforceable. Nolte v. Meyer, 79 Texas 351, 15 S. W. 276; Paschal v. Acklin, 27 Texas 174; 2 Perry Law of Trusts 1206.

As to whether the lawyer who wrote the will, also being the attorney for the bank, occupying a position of confidential relationship to the textatrix, see Leeder v. Leeder, 161 S. W. (2d) 1112; Kelly v. Settegast, 68 Texas 13, 2 S. W. 870; Pomeroy's Equity Jurisprudence, 5th Ed., page 790, sec. 956.

*S. S. Searcy, Marion A. Olson, Denman, Franklin & Denman,* all of San Antonio, and *Black, Graves & Stayton,* of Austin, for respondents.

The provision of Mrs. Pryor's will creating a charitable trust

and appointing a trustee to whom she gave discretionary power to select the organizations to which the income from the trust estate shall be paid are sufficiently definite and may be enforced by a court of equity. 2 Perry on Trusts, 7 Ed. sec. 687; Powers v. First Natl. Bank, 137 S. W. (2d) 839.

The Court of Civil Appeals correctly held that the will in question had been duly executed and established as a matter of law. Campbell v. Barrera, 32 S. W. 724, Laborde v. First National Bank & Trust Co., 101 S. W. (2d) 389.

MR. JUSTICE SIMPSON delivered the opinion of the Court.

Mrs. Myra Stafford Pryor, by a will dated December 14, 1938, and a codicil added January 29, 1943, devised all her property, with the exception of certain personal bequests and other specific charitable bequests, to a general charitable trust in perpetuity, to be designated the "Myra Stafford Pryor Charitable Trust." The language by which she sought to establish this trust is found in paragraph IV of the original will, reading:

"It is my primary purpose and intent that the TRUST hereby created shall be a charitable trust, and shall be and is designated the 'MYRA STAFFORD PRYOR CHARITABLE TRUST' and when the last survivor of the living persons named above as beneficiaries shall have died, it will be wholly a trust created for charitable purposes in perpetuity. Any and all net income remaining in the possession of the Trustee, after the specific payments hereinabove provided for in paragraph III of this my will have been made, shall be paid to such charitable association or associations, whether incorporated or not, as my Trustee shall in its absolute discretion select and in such amounts and at such times as my said Trustee, in its absolute discretion, may fix, to be used and applied by such association or associations so selected by my Trustee as such association or associations may deem advisable. The corpus of this Trust shall remain intact and the income alone used for the purposes of this trust."

By the will she also vested title to her property in the Frost National Bank of San Antonio, "or its successor or successors, in trust, nevertheless, and as trustee," and charged that bank with the duty of executing the provisions of the trust.

Mrs. Pryor died June 30, 1943, leaving an estate valued at almost one million dollars. Her will was admitted to probate in the county court of Bexar County, where subsequently certain

collateral kindred, the petitioners here, moved unsuccessfully to set aside the order probating it. They appealed to the district court, where except for certain bequests to St. Mark's Church and Ike T. Pryor, Jr., and a provision appointing the Frost National Bank independent executor, the entire will was held invalid. Upon an appeal from that judgment, the Court of Civil Appeals took a different view and upheld the will. In this we think the Court of Civil Appeals was correct. 188 S. W. (2d) 199.

■ Petitioners ably argue that the charitable trust Mrs. Pryor sought to establish is described in language so general, vague and indefinite that it fails to meet both statutory requirements and judicial precedents in Texas, is not sustainable under the weight of American authority, and should be declared invalid. This attack is pressed from many angles, but we conclude that every objection must be overruled if a bequest to charity generally, coupled with the appointment of a trustee able and willing to serve and empowered to select the charitable objects to which the trust funds are to be devoted, is valid testamentary disposition.

■ In the formative years of Texas judicial history, a liberal course regarding charities was charted by the courts, a course which has since been resolutely followed and from which there has been no departure. As early as Hopkins v. Upshur, 20 Texas 89, decided in 1857, then Associate Justice Oran M. Roberts announced the power of a court of equity in Texas to uphold and enforce a charitable trust. He said:

"Another objection to this suit is taken, which strikes at its foundation; that is, that a court of equity has no power in this state to uphold and enforce such a trust for a charity. It is contended that this jurisdiction was given to the court in England by statute; and there being no such statute here, the power is wanting. See case cited by appellee, Green et al v. Allen et al. 5 Humph. 170. We think the contrary is settled by the weight of authority, and that a court of equity has such power by virtue of its general jurisdiction, independent of a statute. This is fully shown in a case decided by the supreme court of the United States, of Vidal et al v. The Citizens of Philadelphia et al. 2 How. 127." 20 Texas 89, 95.

The following year, in the often cited case of Bell County v. Alexander, 22 Texas 350, 73 Am. Dec. 268, Chief Justice Wheeler declined to follow the rule which had been announced by the United States Supreme Court in 1819 in Baptist Association v.

Hart, 4 Wheat. 1, 4 L. Ed. 499, where it was held that legacies to charities were sustainable in England only under the statute of 43 Elizabeth or of the prerogative of the crown, "and not in virtue of those rules by which a court of equity, exercising its ordinary powers, is governed." Chief Justice Wheeler chose to align Texas with the the better considered view developed in 1844 by that great equity lawyer, judge and author, Justice Story, in Vidal v. Girard's Executors, 2 How. 127, 11 L. Ed. 205, which in its effect overruled Baptist Association v. Hart and announced that inherent jurisdiction of a court of equity to enforce charitable gifts, even "where there were trustees appointed for general and indefinite charities," existed long before the statute of 43 Elizabeth and that cases of charity in courts of equity in England were valid independently of that statute.

Much the same liberal view characterized the opinion in Paschal v. Acklin, 27 Texas 173, decided in 1863, which declared that although the English doctrine of *cy pres* had never been adopted in Texas, still a charitable bequest to "the poor of Sumner County" was not too vague and uncertain a description of the beneficiaries to be sustained by our courts. And in the Paschal case the coolness toward charity manifested by the holding in Baptist Association v. Hart was again rejected in Texas and the cordial and sympathetic attitude which character- the opinions in Vidal v. Girard's Executors and Bell County v. Alexander was reaffirmed. Subsequent cases manifesting the same disposition are Gidley v. Lovenberg, 35 Texas Civ. App. 203, 79 S. W. 831 (error refused) ; City of Houston v. Scottish Rite Benevolment Ass'n, 111 Texas 191, 230 S. W. 978; and Powers v. First National Bank of Corsicana, 138 Texas 604, 161 S. W. (2d) 273, affirming 137 S. W. (2d) 839.

■ Petitioners' contention that the bequest in question is so general, vague and indefinite that it cannot be enforced by the courts has never been directly decided in Texas. But the decisions cited indicate a definite trend in this State contrary to that position, and the weight of authority both in this country and in England, as well as what we consider the better reasoning, supports the validity of the bequest. Thus, in the American Law Institute's Restatement of the Law of Trusts, sec. 396, p. 1189, it is declared: "A charitable trust is valid, although by the terms of the trust the trustee is authorized to apply the trust property to any charitable purpose which he may select, if the trustee is able and willing to make the selection." In a like vein, it is said in 10 Am. Jur., Charities, sec. 83, that "if a trustee is appointed

by the testator and the will shows that the object of the devise, although expressed in general terms, is for a charitable use, the trust will be declared valid." The rule is stated and discussed by Professor Scott in his work on Trusts (vol. 3, sec. 396) as follows:

"A testator may devise or bequeath property in trust for charitable purposes without designating the particular purposes to which he wishes the property to be applied. He may leave the property to trustees for such charitable purposes as they may select. Such a disposition is valid according to the great weight of authority. If the trustee is ready and willing to make the selection, there is no reason why he should not be permitted to do so. This is true where the testator designates the general nature of the charitable purposes to which he desires the property to be applied. It is true also where the trustee is left free to devote the property to any charitable purpose he may select.

"There are, indeed, a few cases in which it was held that the trust failed for uncertainty even though the trustee was given authority to select the charitable purposes to which it should be applied and was ready and willing to exercise this authority. In these cases the clear intention of the testator is defeated, and no good reason can be given for defeating it. As long as the purposes to which the property is to be applied are limited to charitable purposes, there is no reason why the trust should not be carried out in accordance with the intention of the testator." Also see 2 Perry, Law of Trusts and Trustees (7th ed.), sec. 713a; Zollman, American Law of Charities, sec. 433.

■ Coming to an analysis of the language employed to establish the questioned trust, Mrs. Pryor stated in her will that it was to be a "charitable trust," a trust to be known as the "Myra Stafford Pryor Charitable Trust," a trust created for "charitable purposes in perpetuity." She directed her trustee to pay the net income from the trust estate to any such charitable associations the trustee might select, to be expended as the associations might deem advisable. Mrs. Pryor's intentions are manifestly plain. She intended to and did effectually define the entire field of charity as the beneficiary of this trust. Instead of specifying one by one the various purposes which the law recognizes as occupying the field of charity, she comprehensively gathered them all into one general term. The whole thus designated in her will certainly embraces all of its components. By employing the term "charitable purposes" Mrs. Pryor was being exact and not vague; she was employing words of art having

a definitely ascertainable meaning in law; she was obviously undertaking to establish a charity catholic and universal rather than parochial and narrow in its scope and beneficence. The courts should be most unwilling to dissappoint the expense and magnificence of her vision by frustrating the wishes she has thus plainly expressed. We conclude that her will should not be frustrated merely because she failed to go into a multitude of detail in establishing this trust, detail necessarily encompassed in the comprehensive language she employed. She had effectively established a general charitable trust which we hold a valid disposition.

■ Petitioners vigorously press the contention that because of the generality of the bequest, the trustee will be unable to administer the trust; that the courts would be required to exercise prerogative or creative powers in the selection of charitable objects to which the income from the trust should be devoted,— powers which the courts in Texas admittedly do not have. However, these results do not at all follow. The authorities leave no doubt that the words "charitable purposes" have a fixed meaning in law and that a judicial determination may be made with satisfactory certainty in every case where the question of whether a given purpose is or is not charitable arises. Chapter 4 of the statutes of 43 Elizabeth, enacted in 1601, known as the statute of Charitable Uses, although not adopted in Texas, "is regarded by many authorities as the principal test and evidence of what the law will consider charitable uses," and the enumeration of those uses as set out in the preamble to the act was accepted as authoritative in Powers v First National Bank of Corsicana, 138 Texas 604, 161 S. W. (2d) 273.

Illuminative in this regard is the following quotation from Zollman's American Law of Charities, sec. 187, p. 123:

"It must never be forgotten that the words 'charity' and 'charitable' are technical terms. Since the statute of Elizabeth, they have had a technical meaning both in England and America, including even those states in which the statute has been repealed or has not been re-enacted or adopted. 'They are lifted from their popular and lexicographical meaning. In them survives a history from which they have derived a special significance. They condense volumes of controversy and decision into a phrase which must be now read by the growing light under which it has been developed.'"

And the following excellent definition of "charity" and "a

charitable use" is evolved in 2 Perry, Trusts and Trustees (7th ed.), sec. 697, p. 1182:

"It will be seen that the words 'charity' and 'a charitable use' have a somewhat technical meaning in the law. * * * The word 'charity' in its *widest* sense, denotes all the good affections men ought to bear toward each other; in a more restricted sense, it means relief or alms to the poor; but in a court of chancery the signification of the word is derived from the statute of Elizabeth, (and a public charity need have no special reference to the poor.) Hence it has been said that those purposes are considered charitable which are enumerated in the statute, or which by analogy are deemed within its spirit or intendment. Another short but practical definition has described it as 'a gift to a general public use, which extends to the poor as well as the rich.' But Mr. Justice Gray has given a definition which includes all the facts and circumstances, and all varities of charity under the law, and leaves nothing to be desired. In his words 'a charity in a legal sense may be more fully defined as a gift to be applied, consistently with existing laws, for the benefit of an indefinite number of persons,—either by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government.' "

Current legal concepts of what are charitable purposes are well gathered into the following classification in II Restatement, Trusts, sec. 368, p. 1140:

"Charitable purposes include
(a) the relief of poverty;
(b) the advancement of education;
(c) the advancement of religion;
(d) the promotion of health;
(e) governmental or municipal purposes;
(f) other purposes the accomplishment of which is beneficial to the community."

Other guides which will satisfactorily conduct the inquirer to an answer of the question, what are charitable purposes, are 2 Bogert, Trusts and Trustees, sec. 361 et seq.; Zolman, American Law of Charities, sec. 184 et seq.; 14 C. J. S., Charities, p. 410 et seq.; 10 Am. Jur., Charities, p. 584 et seq.

So it is quite evident that the trustee will be enabled to

know in advance what purposes are and are not charitable in contemplation of law. It will find hundreds of precedents in decided cases in England and America, reaching back through a history of more than four centuries. There need be no doubt or ambiguity in the trustee's mind as to its duty if it "studies the precedents or takes good legal advice." 2 Bogert, Trusts and Trustees, sec. 371, p. 1139.

Moreover, the trustee, not the court, selects the charity to be served. In no sense is the court called upon to act creatively in making or directing a particular selection. But in the exercise of its chancery powers, a court can intervene to prevent the trust from being devoted to an unauthorized purpose. It may compel a recusant trustee to act, or should the occasion warwant, it may even remove a faithless or inactive trustee and appoint another who will not be recreant to his trust. And should the question be presented for decision, a court can consult the precedents and "be free from any reasonable doubt as to whether there has been a performance of the trust for charity in general or not." 2 Bogert, Trusts and Trustees, sec. 371, p. 1139. No extraordinary or prerogative powers are needed to authorize the court to act. It is the duty of the Attorney General to invoke the powers inherent in our courts to prevent an abuse of the trust. These questions were set at rest in Powers v. First National Bank of Corsicana, which held that as respects a charitable trust, as distinguished from a private trust, it is an official function of the Attorney General of Texas under our constitution and laws to intervene in court "to enforce the trust in event of misfeasance or nonfeasance of the trustee." The following quotation from the Powers case aptly states the breadth of a court's power when called upon to function in a case of charity:

"The plaintiffs' proposition that the powers of the trustee and the beneficiaries of the trust are so uncertain and the discretion of the trustee so unlimited that the trust cannot be administered by a court of equity belittles the broad equity powers of our courts and ignores the fact that public charity trusts are particular favorites of courts of equity, which are quick to protect and enforce them." 138 Texas 604, 621, 161 S. W. (2d) 273, 284.

■ For another reason petitioners urge the invalidity of the trust. They contend that a bequest to "charitable purposes" will include gifts to "private charity" and since the latter may not extend past the period prescribed by the rule against perpetuities, Mrs. Pryor's bequest to a general charitable trust must

fail. We cannot agree with this contention. Mrs. Pryor had been careful to state that she was creating a trust for "charitable purposes in perpetuity." We are asked to hold that she meant to include in these purposes a class, of benevolence which would admittedly invalidate her will, and to resolve matters of construction against rather than in favor of the will's legality. Such a holding would be clearly contrary to the applicable rules of construction, which are well stated in the following language from Powers v. First National Bank of Corsicana:

"If it be conceded that ambiguity exists by reason of the structure of the sentence in question, we believe the same must be resolved in favor of legality. Charities like those specified by Mrs. Hofstetter are held in such high regard by the law that the rules of construction are more liberal to sustain them than they would be if the gifts were to individuals. See Broker v. Brooker, 130 Tex. 27, 106 S. W. (2d) 247; Appendix, 4 Wheat, pp. 9 and 10, note 1; Ingraham v. Ingraham, 169 Ill. 432, 48 N. E. 561, 49 N. E. 320. As said in Jackson v. Phillips, supra: 'When a charitable intent appears on the face of the will, but the terms used are broad enough to allow of the fund being applied either in a lawful or an unlawful manner the gift will be supported, and its application restrained within the bounds of the law.' More concretely, if one construction of a will causes it to violate the rule against perpetuities while another makes it comply therewith, the latter construction will be preferred. Page, Law of Wills, vol. 2, sec. 825, p. 842. 'Public charities are public blessings, and the commonwealth is interested in giving force and effect to them.' Commonwealth v. Y. M. C. A., supra. (116 Ky. 711, 76 S. W. 522, 105 Am. St. Rep. 234). So the court's attitude in considering a bequest intended for a charitable purpurpose should be friendly, not hostile. Noice v. Schnell et al, 101 N. J. Eq. 252, 137 A. 582, 52 A. L. R. 965. It should 'make every reasonable effort to hold that the trust is purely charitable, and not a mixed charitable and private trust which would be invalid.' 2 Bogert, Trusts and Trustees, sec. 369." 138 Texas 604, 617, 161 S. W. (2d) 273, 282.

We find no difficulty in concluding that if the income from the Myra Stafford Pryor Charitable Trust were devoted to any purpose not included in what the law regards as charitable, there would be a clear breach of the trust. To pay the income to so-called "private charity" would violate her plain direction. The term "private charity" is frequently employed by text writers and in the decisions, but in each case its exact meaning must be determined from the context. If by the term a non-charitable

use is connoted it is somewhat self-contradictory. Rather than employing the terms "private charity" and "public charity," the following terminology and classification suggested by Professor Bogert in connection with the law of charitable trusts is thought more satisfactory:

"The terms 'public charity' and 'private charity' are sometimes used. They do not seem to have clearly fixed meanings. Sometimes the difference depends on a taxation statute. Sometimes public charity is used to mean charity distributed through a public institution, as distinguished from charity given out by private individuals. In other cases apparently private charity is deemed to include liberality and other elements not strictly charitable, and to permit the giving of funds without strict regard to the need of the donee or the effect of the gift upon him. For the purposes of the law of charitable trusts it is believed confusing to employ these two phrases. A trust should, for these purposes, be construed to be either charitable, private, or mixed. The words 'charitable' and 'public' are synonymous." 2 Bogert, Trusts and Trustees, sec. 362, p. 1099.

It is apparent that "private charity" in the sence petitioners use that term is not charity at all, and the trustee would be wholly unauthorized to pay income arising from the trust to groups in this classification.

Pointing to the language Mrs. Pryor employed to empowered her trustee to pay over the income to any charitable association the trustee might "in its absolute discretion select," petitioners urge that the discretion thus lodged is so broad that the trustee is authorized to expend the trust income for purposes other than charitable ones. This contention is deemed untenable. The discretion lodged in the trustee is not to be construed a license to abuse the trust but a responsibility faithfully to execute it. Even though vested with a broad discretion, the trustee must exercise it reasonably, never arbitrarily. Reasonableness, diligence and fidelity must characterize the trustee's conduct, and the courts will not tolerate any departure from those high standards. Equity is prepared to assert all such control over the discretionary powers of the trustee as may be necessary "to prevent the frustration of the fundamental intent of the settlor" and to compel a true performance of the trustee's duties. 3 Bogert, Trusts and Trustee, sec. 560; 2 Scott on Trusts, sec. 187; I Restatement, Trusts, sec. 187; Carrier v. Carrier, 226 N. Y. 114, 123 N. E. 135.

■ Similar to the petitioners' contention that the trustee's wide discretion might afford opportunities for abuse, the point is also pressed that the trustee might "reap large profits from administering the trust" with the result that the "trust is no charitable trust at all." This position presupposes an undoubted violation of the trust, which, as we have observed, the courts have ample power to correct. The trustee would never be warranted in making unreasonable charges for services or expenses. It is plainly to the interest of the trust estate to be sure of the services of a competent trustee, and it is no objection to the validity of the disposition that the agency administering it is reasonably compensated. What are commonly owned to be wise and effective protections by both state and federal statutes and regulations have been thrown about the operation of chartered bank and trust companies. See generally Texas Trust Act; Vernon's St. Art. 7425; Texas Banking Code of 1943.; Title 12 U. S. C. A. These protections have greatly added to the serviceability of those institutions. And if a testator names a compensated chartered association to administer the provisions of a charitable trust, there is certainly no impropriety in his making that selection. In this connection, Professor Bogert aptly discussed charges a trustee may properly make as follows:

"But the rule that the operation of the alleged charity must not produce private profits does not mean that the trustees may not make charges for the benefits they distribute. So long as such charges are not established for the purpose of making a net profit from the enterprise for the benefit of the founders or operators, there is no objection. If the charges merely enable the trustees to distribute more charitable benefits, they do not militate against the charitable nature of the trust. There is no doctrine that the charitable benefits must reach the public free of all cost." 2 Bogert, Trusts and Trustees, sec. 365, p. 1114.

Just as was done in this case, a compensated corporate trustee was appointed by the testatrix in Powers v. First National Bank of Corsicana, and the validity of the trust does not appear to have been questioned because of that selection. From what has been said, we conclude that Mrs. Pryor's appointment of the Frost National Bank as a compensated trustee does not invalidate the trust.

■ Petitioners also contend that the discretion of the trustee is so unlimited that it might postpone the disbursement of the income past the period prescribed by the rule against perpetuities and thus bring about the trust's invalidity. Of course, all will

agree that a charitable trust may exist in perpetuity. If, as here, the title to the property itself vests in the trustee before the period prescribed by the rule has elapsed, the trustee is not required to disburse the income to charitable purposes within that period. So to require would abrogate the principle that the rule against perpetuities has no application to charitable trusts. The income from this fund is to be paid over to charitable purposes forever. It was quite legal for Mrs. Pryor so to provide. Of course, it is not to be assumed from this holding that the trustee might with impunity postpone indefinitely a distribution of the trust income to charity. To delay such a distribution unreasonably and unnecessarily would comprise an actionable breach of the trustee's duties. While a court would not assume to select the particular charitable purpose or association to which the trustee should make a distribution, it would have power to order a recusant or unreasonably dilatory trustee to proceed with a selection and distribution, and if that trustee refused to comply with the order, it would be the duty of the court to appoint another who would. Zollman, American Law of Charities, secs. 545, to 556, inclusive; II Restatement, Trusts, sec. 401.

■ We are also urged to hold this trust invalid because Mrs. Pryor directed her trustee to pay the net income from the trust to such charitable associations as her trustee might select, to be "used and applied by such association or associations so selected by my trustee as such association or associations may deem advisable." It is urgently insisted that this language of the will would expressly allow the recipients of the income to expend it for non-charitable purposes and so deprive the trust of its character as a charitable one, thus bringing about its invalidity. We deem this position untenable. When a charitable association receives a gift from the trustee of a charitable trust, it will be presumed that the gift is exclusively for charitable purposes, and the association would be wholly unauthorized to devote it otherwise than to charity only. In making a selection of associations to which the income from the trust is to be paid, the trustee can determine in the light of settled principles what are charitable associations just as it might determine what are, in law, charitable purposes. If a controversy as to the eligibility of an association to enjoy the benefiits of the trust should arise, our courts, as we have seen, have abundant power to settle the dispute by an appropriate decree. Moreover, should such an association divert from charitable purposes funds transferred to it by the trustee, adequate power to restrain and correct this diversion and want of good faith inheres in Texas courts. Much

the same arguments were advanced and rejected in Powers v. First National Bank of Corsicana. At least in part, these contentions were also advanced in King v. Rockwell, 93 N. J. Eq. 46, 115 Atl. 40, where it was urged that "the gift is not necessarily to charity, inasmuch as, although the executors must designate as beneficiaries charitable organizations, associations, or institutions, pursuant to the directions of the will, still those organizations might, perchance, expend their moneys for purposes which were not charitable." In disposing of this contention, the Court of Chancery of New Jersey quoted the following from the earlier case of De Camp v. Dobbins, 29 N. J. Eq. 36:

"A gift to a charitable institution or society will be presumed to be a charitable gift, though no purpose is named, and such institution or society will be presumed to hold such gifts in trust for those charitable purposes for which it exists."

Petitioners rely on Allred v. Beggs, 125 Texas 584, 84 S. W. (2d) 223, in support of many of their contentions. What that case determined was that the Attorney General could not sue to remove an executor for a claimed abuse of discretion when the will empowered the latter to devote the decedent's estate to "such charities and worthy objects" as the executor and the decedent's sister might select." Since the will expressly allowed the executor to deliver the estate to "worthy objects" which might not be charitable at all, it was held that the trust was not an exclusively charitable one and the Attorney General could not under these circumstances intervene to inquire into the exercise of the executor's discretion. The general language in that opinion, upon which petitioners chiefly rely, does not when rightly understood, announce principles contrary to our disposition of this case.

Petitioners take the further position that under the undisputed proof the will and its codicil do not represent the "intent and desires" of the testatrix and that the burden rested upon the proponents of the will to show that Mrs. Pryor read and understood it, a burden it is claimed they failed to meet.

As to the contention that the will and codicil did not express Mrs. Pryor's intent and desires, we appraise the uncontradicted evidence as compelling a different view. Mrs. Pryor had selected her attorney and he had proceeded with the drafting of the will under the following circumstances: In the course of a conference with the trust officer of the Frost National Bank,

Mrs. Pryor, who was not a customer of that bank and was not even intimately acquainted with its trust officer, had inquired if she could "leave a sum for charity." That officer replied he thought so but she would have to get her own lawyer to draw the will. She replied she had no regular lawyer right then, and asked who the bank's lawyer was. Upon learning, she inquired if that attorney would be willing to consult with her. The trust officer replied affirmatively, and pursuant to this conversation the attorney was employed. All conferences were held at the home of Mrs. Pryor, who got about with difficulty due to an ancient injury.

In the first and only conference with her attorney, Mrs. Pryor dictated from a memorandum what she wanted done, and the will was drafted in preliminary form from notes the attorney made on that occasion. After casting up this draft, the attorney mailed it to Mrs. Pryor. When the draft had been in her hands over three weeks, it was returned to the attorney, bearing notations of desired changes. The will was then redrafted and the requested changes included in a final form, after which the attorney mailed the preliminary as well as the final draft to the testatrix. About a week later she executed the testament before competent witnesses.

As to the codicil, more than four years after the execution of the will Mrs. Pryor's secretary carried a memorandum of changes and additions to the same attorney, who drafted a codicil in accordance with the memorandum, and on January 25, 1943, mailed both the codicil and the memorandum to Mrs. Pryor along with a letter asking her to let him know if for any reason the codicil was not just what she wanted. Mrs. Pryor's secretary brought this codicil back to the attorney with the request that one minor change be made, which was accordingly done. The testatrix executed the corrected document before witnesses as required by law on January 29, 1943.

It is contended that because the trust officer of the Frost National Bank had told Mrs. Pryor that the trust department's charges would "run about one-half of one per cent of the value of the estate" without elaborating that this charge was an annual one and that expenses incurred in administering the trust would also be charged, it conclusively appears that the will did not represent Mrs. Pryor's wishes. It is observed that the will itself stated in plain language, so plain it indeed needed no explaining, that the trust department charge was an annual one and that additional charges for expenses would be made. There

is no evidence that the proposed charges were not reasonable and necessary ones.

The proofs do not reflect that Mrs. Pryor had the provisions of the will explained to her. On the other hand, the evidence does not suggest any necessity for such an explanation. Mrs. Pryor had taken ample time to enable her to consider and weigh every provision of the written will after receiving the first draft and before executing the final one. The entire instrutment was clearly worded. No overreaching or undue influence is even suggested. The testatrix was shown to have been a woman of "sound mind" and "firm mentality." We hold as a matter of law that the evidence shows the will truly expressed Mrs. Pryor's testamentary desires.

What has been said regarding the will applies also to the codicil. The circumstances surrounding the drafting and execution of this document compel the conclusion that its language expressed the will of Mrs. Pryor. It is true that she utilized the services of her secretary, to act as a messenger to her attorney, but it would be wholly conjectual to attach any suspicion to this circumstance. In the codicil the secretary was bequeathed an income of $50.00 a month for life, which entailed a relatively inconsequental part of Mrs. Pryor's aggregate estate and only a small fraction of the value of the total bequests in the codicil. These circumstances do not at all militate against the conclusion that Mrs. Pryor was fully apprized of the import of the codicil. We hold the evidence shows she was.

■ It is also contended that because Mrs. Pryor had selected for her attorney one whom the proofs showed also to have been a director and the legal adviser of the bank, there was a conflict of interest and the burden was upon the respondents as proponents of the will to show not only its execution but also that Mrs. Pryor fully understood the testament. In a direct proceeding to set aside the probate of a will, the burden is not so cast by the statute nor under the decisions, but rests upon those seeking to have the will declared invalid. Art. 5534, R. S.; Howley v. Sweeney (Tex. Civ. App.), 288 S. W. 602; Fowler v. Stagner, 55 Texas 393. Apart from this principle, however, the evidence demonstrates, as has been observed, that the will and codicil did in fact represent the wishes of the testatrix. It does not follow that suspicion was thrown upon these testaments because of the relation between Mrs. Pryor and her lawyer, nor because of any other circumstance in evidence. The record indicates Mrs. Pryor's full testamentary capacity rather than the

contrary. She signed both instruments before disinterested, qualified witnesses and in the absence of any officer or agent of the bank. Good faith and fair dealing characterized the making of the will and the codicil and every relation of the parties regarding them. No such situation is presented here as obtained in the cases cited by petitioners in this connection. For instance, they rely on Kelly v. Settegast, 68 Texas 13, 2 S. W. 870, where it was in evidence that the testator, a man unable to read or write, while gravely ill at the house of one of his legatees, so ill it was doubtful he understood what he was doing, signed a will by mark disinheriting his only living daughter, who was in the same house at the time and did not even know her father was making a will. Neither beneficiary in the will was related to the testator. It was not shown that he ever gave anyone instructions to write a will nor that he had requested one to be written. There were other "suspicious circumstances, but those detailed will suffice to illustrate the inapplicability of that case here. In that decision, it was said that "in such a case we are of the opinion that it should be shown that the testator correctly understood the contents of the paper which he signed, and that the mere formal proof of the execution of the paper is not enough to entitle it to probate."

Under the facts obtaining here, the general rule, also stated in Kelly v. Settegast, rather than the above exception to that rule, applies:

"If a person of sound mind, able to read and write, and in no way incapacitated to acquire knowledge of the contents of a paper, by exercising the faculties he has, signs a testamentary paper, and has it witnessed as required by the statute, then, upon proof of these facts, the will ought to be admitted to probate without further proof that the testatrix knew the contents of the paper, unless suspicion in some way be thrown upon it; for it is to be presumed that every such man examines and knows the contents of every instrument he executes, and especially so when it is made for the purpose of disposing of his estate in the solemn form required by law in the making of wills.

"It has consequently been held that such a person need not be shown to have had knowledge of the contents of a will which he executed under the forms required by law, 'for, when the capacity of a testator is perfect, his knowledge of the contents of his will is presumed from the fact of execution.' "

In addition to the conclusion that the capacity of the testatrix to make a will was "perfect" (to use the word employed in

Kelly v. Settegast), a conclusion which it is clear to use the evidence surrounding the making of the will on December 14, 1938, compels, it is significant that this will was republished as a matter of law by the making of the codicil on January 29, 1943. Not only was the execution of the codicil a republication of the will, but the latter instrument speaks from the date of the codicil. Campbell v. Barrera (Tex. Civ. App.), 32 S. W. 724; Laborde v. First State Bank & Trust Co. (Tex. Civ. App.), 101 S. W. (2d) 389 (error refused). It must be presumed in law, and a most reasonable presumption indeed, that the testatrix reexamined the entire testamentary disposition of her property prior to executing the 1943 codicil and, except for the changes she then made, solemnly willed that her earlier disposition represented her last and unrevoked testamentary wishes,—wishes which the courts ought to respect most scrupulously.

The judgment of the Court of Civil Appeals is affirmed.

Opinion delivered July 10, 1946.

Rehearing overruled October 23, 1946.

MR. JUSTICE SLATTON, dissenting.

In my opinion the trust attempted to be created should be held void because the language employed is too vague, indefinite and uncertain to create a valid charitable trust. This view was entertained by the trial court.

Courts upholding a general charitable trust consist of jurisdictions where the legislature has adopted the English statute of charitable uses (43. Elizabeth) as a part of the common law, or have by legislative action validated indefinite bequests for charity.

Texas has not adopted the English statute of charitable uses as a part of the common law. 9 Texas Jurisprudence, 310, Sec. 11. Concededly, the Legislature has not validated indefinite charitable trusts.

The will of Mrs. Pryor provides for the corporate trustee to be independent of the probate court.

The point of difference is best stated by the Supreme Court of Illinois (where the statute of charitable uses was adopted as the common law of that state) in the case of Welch v. Caldwell, 226 Ill. 488, 80 N. E. 1014, 1016:

"There is, perhaps, no subject concerning which there is a greater diversity of decisions in the different states than the certainty and definiteness required in the beneficiaries and objects of a charity. The radical differences in the views of the courts have been produced, to some extent, by statutory provisions, and largely by the question whether the statute of 43 Elizabeth has been recognized or adopted as the law of the state. In some states the statute is not recognized as a part of the law, and in others all trusts, except those specifically enumerated in statutes, have been abolished, and in those states objects and beneficiaries must be described with great certainty. In States where the statute of Elizabeth is in force as a part of the law, the disposition has been to follow English rules to a great extent and to permit a great degree of uncertainty as to beneficiaries. * * *."

It was stated by this court in Paul v. Ball, 31 Texas 10:

"It would be dangerous * * * to submit too implicitly to rules of construction founded entirely upon English jurisprudence."

This court held in the case of Powers v. First National Bank of Corsicana, 138 Texas 604, 161 S. W. (2d) 273, where the trust instrument specified the particular objects and classes, that the statute of charitable uses may be looked to as the test of what the law will consider charitable uses, but in the Powers case the creator of the trust had specified the particular objects and classes to which the trustee was limited in choosing the beneficiaries of the trust. The Powers case is illustrative of the proper limitation of the rule which should exist in this state.

The creator of the trust in the Powers case had laid down a plan which specified and described the objects of charity to which the trustee was limited in the selection of beneficiaries. The trustee was to make the selection and pay the funds annually. In the present case, the object of the charity is not described or named, and by explicity language in the instrument the corporate trustee is given unlimited power to select both the charitable uses and the beneficiaries thereof if and when it chooses within its "absolute discretion."

The prevailing rule existing within the jurisdictions of the United States may be classified as follows: First, states that have statutory provisions whereby the legislature as the parens patriae conferred upon a court prerogative powers concerning charitable bequests. Second, other states where the statute of

43 Elizabeth has been recognized or adopted as a part of the law of the state. Third, others were the statute of 43 Elizabeth is not a part of the common law; Obviously, Texas belongs in the third group. Admittedly, those belonging to the third group frequently apply the statute of charitable uses as a test of whether or not a bequest is charitable. The applicable rule which should prevail in this state is well stated in Crim v. Williamson, 180 Ala. 179, 60 So. 293, which is quoted with approval in the case of Hedin v. Wesdala Lutheran Church, 59 Idaho 241, 81 Pac. (2d) 741, local citation 744. We quote from the Crim case:

"In every state of the union, including Alabama, where the cy pres doctrine is not recognized, it is the settled law that although the particular individuals who are to benefit by the charity need not be specified, still the object of the charity must be named or described. The want of a trustee will not defeat the charity, but the object of the charity must be ascertained, else the court would have to substitute its own selected charity or permit the trustee to select the charity, and which the law does not authorize. * * * Where the gift for a charitable use is so indefinite as to be incapable of being executed by a judicial decree, the gift is void."

This rule is supported by the following authorities in the names jurisdictions: Connecticut, Bristol v. Bristol, 53 Conn. 242, 5 Atl. 687; Georgia, Egleston v. Trust Co. of Georgia, 147 Ga. 154, 93 S. E. 84; Idaho, Hedin v. Westdala Lutheran Church, 59 Idaho 241, 81 P. (2d) 741; Indiana, Grimes v. Harmon, 33 Ind. 198, 9 Am. Rep. 690; Kentucky, Gooding v. Watson's Trustee, 235 Ky. 562; 31 S. W. (2d) 919; Maryland, Gambel v. Trippe, 75 Md. 252, 23 Atl. 461, 15 L. R. A. 235, 32 Am. St. Rep. 388; Michigan, Attorney General v. Soule, 28 Mich. 153; Minnesota, In re Ford's Estate, 144 Minn. 454, 175 N. W. 913; Mississippi, National Bank of Greece v. Savarika, 167 Miss. 571, 148 So. 649; Missouri, Wentura v. Kinnerk, 319 Mo. 1068, 5 S. W. (2d) 66; New York, Tilden v. Green, 130 N. Y. 29, 28 N. E. 880, 14 L.R.A. 33, 27 Am. St. Rep. 487; Read v. Williams, 125 N. Y. 560, 26 N. E. 730, 21 Am. St. Rep. 748; North Carolina, Woodcock v. Wachovia Bank & Trust Co., 214 N. C. 224, 199 S. E. 20; Ohio, Rogers v. Rea, Trustee, 98 Ohio St. 315, 120 N. E. 828; South Carolina, City of Columbia v. Monteith, 139 S. C. 262, 137 S. E. 727; Tennessee, Johnson v. Johnson, 92 Tenn. 559, 23 S. W. 114, 22 L. R. A. 179, 36 Am. St. Rep. 104; Jones v. Green, (Tenn. Ch. App.) 36 S. W. 729; Davis v. Bullington, 164 Tenn. 272, 47 S. W. (2d) 555; Virginia, Moore v. Perkins, 169 Va. 175, 192 S. E. 806; West Virginia, Arnett v.

Fairmont Trust Co., 70 W. Va. 296, 73 S. E. 930; Wisconsin, Harrington .v. Pier, 105 Wis. 485, 82 N. W. 345, 50 L. R. A. 307, 76 Am. St. Rep. 924; Federal, Eighth Circuit, Mississippi Valley Trust Co. v. Commissioner, 72 Fed. (2d) 197, and Methodist Episcopal Church v. Walters, D. C. 50 Fed. (2d) 416.

True it is that the legislature has in some of the states either changed the common law of the state by legislative enactment and has validated bequests where a trustee is named with power to select the beneficiary from charitable objects in general. Moreover, in most of those states the courts have been vested with power to supervise and administer charitable trusts, and in most or all of them the trustee is required by statute to account regularly to the court having jurisdiction. See statutory laws of Minchigan, Indiana, New York and Connecticutt. It will be observed that in Pennsylvania, as early as 1855, a statute was adopted validating indefinite and uncertain bequests for "any religious, charitable, literary or scientific use." In the state of Rhode Island the first statute on charitable uses was enacted in 1721. See Pell v. Mercer, 14 R. I. 412. In the states of Maine, Illinois and Massachusetts the statute of charitable uses was adopted as a part of the common law. We call attention to the above fact because it is my opinion that the majority has relied too strongly upon statements from text writers on the subject of charitable trusts, who have stated the rule existing in jurisdictions belonging to the first and second groups.

But, as we have heretofore pointed out, the Legislature of Texas has not adopted the statute of 43 Elizabeth; neither has it validated by statute indefinite trusts.

Most of the authorities cited by the text writers, and upon which respondents strongly rely, are as follows: Fox v. Gibbs, 86 Me. 87, 29 Atl. 940. In Maine statutes exist which require accounting of trustees. Chapter 82 Secs. 1, 10 and 11, R. S. Maine 1930. 43 Elizabeth is a part of the common law. Tappan v. Deblois, 45 Me. 122.

White v. Ditson, 140 Mass. 351, 4 N. E. 606, 54 Am. Rep. 473. 43 Elizabeth is a part of the common law. Pierce v. Attwill, 234 Mass. 389, 125 N. E. 609. Statutes of the state require annual accounting of trustees.

St. James Orphan Asylum v. Shelby, 60 Neb. 796, 84 N. E. 273, 83 Am. St. Rep. 553. Nebraska has validated indefinite bequests to charity. Chap 24, Art. 913, R. S. 1929.

Goodale v. Maloney, 60 N. H. 528, 49 Am. Rep. 334. This case does not involve a charitable trust, but the laws of New Hampshire subject trustees to control by the courts. Chapter 309, Secs. 4, 5 and 6, R. S. 1926.

King v. Rockwell, 93 N. J. Eq. 46, 115 Atl. 40. The laws of the state of New Jersey provide for a prerogative court and orphans' court. The constitution of the state proclaim the public policy of the common law of England "as well as so much of the statute law as have been heretofore practiced in this colony shall still remain in force." Art. 22, New Jersey Const. of July 2, 1776. Practically the same policy is contained in its present constitution. Art. 10, Sec. 1, Constitution of 1844 (amended).

In re Kinike's Estate, 155 Pa. 101, 25 Atl. 1016, and in re De Silver's Estate, 211 Pa. 459, 60 Atl. 1048. These cases were decided after the statute above referred to was passed in 1855. The statute is referred to in the later case.

Selleck v. Thompson, 28 R. I. 350, 67 Atl. 425. Rhode Island, as we have stated, passed a statute in 1721. Others were passed in 1861 and 1866. See Chapter 625, Public Law of Rhode Island, March 1866. See Pell v. Mercer, 14 R. I. 412, and Chap. 487, Sec. 1, General Laws of Rhode Island (Revision of 1936).

In re Planck's Estate, 150 Wash. 301, 272 Pac. 972. 43 Elizabeth is a part of the common law. See annotations following Sec. 143, Chap. 1, Title II, Remington's Rev. Stat. of Washington (1932).

In re Monaghan's Will, 199 Wis. 273, 226 N. W. 306. The court specifically stated that the decision was based upon a statute passed in Wisconsin in 1917 which changed the rule in that state.

Powell v. Hatch, 100 Mo. 592, 14 S. W. 49. 43 Elizabeth is a part of the common law of Missouri. However, in that state it is held in Hadlee v. Forsee, 203 Mo. 418, 101 S. W. 59, 14 L. R. A. N. S. 49, and other cases, that it is necessary to definitely name the purpose and class in a charitable trust.

Estate of Hinckley, 58 Cal. 457. The classes to be benefitted were clearly defined.

Chicago Bank of Commerce v. McPherson, 62 Fed. (2d)

393. The case was turned on the statute of Michigan. See statutes of that state, Acts. No. 122, of the Public Acts of 1907; Acts No. 280 of 1915, Secs. 13516-13517 of 1925, and Sec. 13512-13513 of 929. The court noted the change in the rule of decision in virtue of the statutes. (62 Fed. (2d) 395).

The Supreme Court of Texas, as late as June 12, 1935, some three years before the document in question was written, declared the law to be as follows: We quote from Allred v. Beggs, 125 Texas 584, 84 S. W. (2d) 223, 227:

"1. Before a court of equity is authorized to interfere to enforce a charitable trust, its jurisdiction must be invoked by some party authorized to initiate the proceeding. The court cannot act on its own initiative. 11 C. J., p. 366, Sec. 83.

"2. The Attorney General may invoke the powers of a court of equity to enforce a trust for public charity. 11 C. J., p. 367, Sec. 84; Id., p. 368, Sec. 90; Attorney General v. Benjamin Soule, 28 Mich., 153. In this connection it is held that before the Attorney General is authorized to sue to enforce a charity, it must be so public in nature or character as to be of interest to the entire public or the public in general. A charity for the orphan children of a state is a public charity, but a charity for the orphan children of deceased Masons, Odd Fellows, Baptists, Catholics, etc., of a state is not a public charity. Philadelphia v. Masonic Home, 160 Pa. 572, 28 Atl. 954, 23 L. R. A. 545, 40 Am. St. Rep. 736; Troutman v. DeBoissiere, etc. 66 Kan. 1, 71 Pac. 286.

"3. When a fund or property is so given that it may or may not be used for charity, or may or may not be used for a charitable object of a public character, without violating the directions of the will, the case is not one for enforcing the gift as a charity in a suit by the Attorney General. Attorney General v. Soule et al, 28 Mich. 153; Perry on Trusts & Trustees, 6th Ed., Vol. 2. p. 1164, Sec. 711. These authorities could be multiplied, but they are sufficient.

"4. If a testator leaves his estate to charity generally, but authorizes his executor to determine for what charitable purposes it shall be used, and to select the beneficiaries thereof, and the will contains no other definite manner of selection, the trust is a personal one and a court of equity does not have jurisdiction to determine the purpose or select beneficiaries. Langley v. Harris, 23 Texas 565; Perry on Trusts & Trustees, 6th ed. Vol. 2, p. 1184, Sec. 721; Id. p. 1211, Sec. 731; Fontain

v. Ravenel, 58 U. S. (17 How.) 369, 15 L. Ed. 80; Gambell v. Trippe, 75 Md. 252, 23 Atl. 461, 15 L. R. A. 235; Hadley v. Forsee, 203 Mo. 418, 101 S. W. 59, 14 L. R. A. (N. S.) 49; Tilden v. Green, 130 N. Y. 29, 28 N. E. 880, 14 L. R. A. 33, 27 Am. St. Rep. 487. In this connection, it is held that chancery courts in this country exercise judicial powers only. Powers not judicial exercised by the Chancellor in England merely as the representative of the Crown, and by virtue of the King's prerogative as parens patriae, are not possessed by our equity courts. Fontain v. Ravenel, supra; Perry on Trusts & Trustees, 6th Ed. Vol. 2, p. 1186."

The trustee seeks to avoid the force of this decision by stating that these declarations of law are dictum. It may be that all that was said in the case was not necessary to the decision of the court, but the case before us calls for a decision of the question; I think the rules announced by this Court are supported by the authorities. The annotator of 14 L. R. A. (N. S.), to a note entitled "Enforcement of General Bequests for Charity or Religion," drew the following conclusion at page 154, which I think is sound:

"But the prevailing rule would seem to be that, in making the selection, the trustees must be limited to a particular locality, or to particular charities or classes of charities; and that a mere limitation to charity generally, or to charitable uses, is too indefinite."

From the case of Spalding v. St. Joseph's Industrial School for Boys, 107 Ky. 382, 54 S. W. 200, we quote at length because of the information contained in the opinion:

"Prior to 1601, equity had jurisdiction of charitable, as of other, trusts; and in that year the statute (43 Eliz. c. 4.) called the 'Statute of Charitable Uses' was adopted, which, by its enumeration of charities, furnished a standard to determine what purposes are deemed charitable, repealed pro tanto the mortmain statutes theretofore adopted, and created a new jurisdiction ancilliary to the existent equity jurisdiction, * * *. But in England, in addition to the jurisdiction of the chancellor as a court to administer trusts before and independent of the statute, as well as by virtue of its provisions, that functionary possessed another power, not judicial, but ministerial, over the charitable trusts; for, as keeper of the king's conscience, under the king's sign manual, he exercised the king's prerogative power as parents patriae to control and carry into effect gifts to charity in general, without any specific pur-

pose being indicated, and to devote gifts made for charitable uses which were illegal, or contrary to public policy, or impossible to be carried into effect, to such other charitable purposes, cy pres the original gift, as he pleased. Moggridge v. Thackwell, 7 Ves. 36b; Perry, Trusts, Sec. 717 et seq. Under this prerogative power, charitable devises in England which happened to be illegal under the statutes have been applied to purposes directly opposite to those intended by the donor, and expressed in the gift: 'No such power' says Mr. Perry (section 718), 'exists in any American magistrates, judicial or ministerial, and none can exists until it is conferred by the legislature. The cases named are not law in America, and probably nothing like them will ever have a place in its jurisprudence.' Mr. Perry (section 723) insists upon the distinction between the cy pres doctrine as a rule of construction for the court, and therefore its exercise as a judicial function, and as a rule of administration, which is, of course, ministerial. In England, as the same officer, the chancellor, exercised the prerogative power of the king, as his minister, and also the judicial power of the court of chancery, and his actions in each behalf are reported in the same books, it became immaterial to distinguish between the power as exercised by the chancellor personally and that exercised judicially. And so, as said by Mr. Perry (section 718), 'no very clear line has been drawn between those established by him exercising his ordinary judicial powers in the court of chancery, and those established by the extraordinary or prerogative powers of the crown exercised through the chancellor. * * * The instances in which such prerogative powers were exercised are reported in the books together with judicial determinations, and thus much misapprehension and confusion have arisen.' For this reason the English authorities upon this subject may be misleading in a state where no such prerogative exists."

There are practical reasons why I am unwilling to subscribe to validating indefinite charitable trusts in Texas, without authority of the legislature.

This court, in Ex Parte Hughes, 133 Texas 505, local citation 510, 129 S. W. (2d) 270, said:

"Under our judicial system our courts have such powers and jurisdiction as are defined by our laws, constitutional and statutory. Under our system there is no such thing as the inherent power of a court, 'if by that is meant a power which a court may exercise without a law authorizing it.' Messner v. Giddings, 65 Texas 301."

I do not see how a court of equity in this state could, on the failure or refusal of the trustee to designate a particular charity, choose one and enforce the same by an equitable decree. Suppose the corporate trustee in this case should fail or refuse to act. What designation of charities could a court of equity in this state declare to be worthy of the bequests provided in the settlor's will? The will provides for an independent trustee, and in no uncertain language provides for the selection by the trustee in its absolute discretion. The charitable uses not being limited by the will to public charities, how can a court of equity say that the settlor intended public charities? Moreover, it has never been authoritatively decided in this state that the Attorney General of Texas has the authority in virtue of his office to require an accounting of a charitable trust. Suppose that the corporate trustee should designate as beneficiaries charitable associations in another state, and assume that some question should arise as to whether or not they were public charities. Does the Attorney General of Texas have the authority to institute suit on behalf of the selected beneficiaries residing in another state? Suppose that in the sound discretion of the corporate trustee, it should decide that for a period of years it would not designate beneficiaries or make payments from the income of the estate. Who in Texas has the authority to institute a proper proceeding and require affirmative action?

In those states where the statutory law has validated indefinite charitable bequests, the authority to require an accounting by the court is generally provided by statute, and where the statute of charitable uses has been adopted as a part of the common law, such power might necessarily follow by implication. This has not been the rule in this state. I think all will agree that before a court of equity is authorized to enforce a charitable trust, its jurisdiction must be invoked by some party authorized to initiate the proceedings. When this proceeding has ended there are no beneficiaries until the trustee makes a selection. Under the terms of the will that time is within the absolute discretion of the trustee. Assume that the attorney general of the state has authority in virtue of his office to initiate proceedings to compel the selection of beneficiaries. The specific terms of the will give the trustee absolute discretion in the premises and in such a case, would not the will be a complete defense to the action?

Mr. Zollman, in his work, American Law of Charities, p. 343, says:

"The experience of England has too clearly demonstrated that unlimited trusts may become an unmitigated evil, and that no contingent good can compensate for the actual evil attendant upon the withdrawal of property from general use and the placing of it in dead hands."

Again, on page 78, he states:

"This American doctrine cannot be used as a creative force to infuse life into gifts which are void per se. It decisively and distinctly presupposes the existence of a valid gift. There must, in every case, be a legal charity properly defined before it can have any application. 'It is not the province of the judges to project schemes of charity for insertion in dead men's wills by way of supplement to partial declarations of trust, void on their faces for uncertainty.' "

It is noted by one of our early predecessors. We quote:

"If bequests for charitable uses have been the means of much social good, they are certainly chargeable with great countervailing evils and have often been the source of great corruption and abuse. They have, perhaps, more frequently proved the subject of protracted wasting and perplexing litigation than of public utility, or the successful means of accomplishing the objects of their donors." Paschal v. Acklin, 27 Texas 174, local citation 197.

The very nature of the instrument here involved, based upon its generalities, the absolute discretion of the corporate trustee or its successor, commends itself as a source of perplexing litigation. No doubt this litigation will involve a substantial sum of money as expenses.

It is not unreasonable, and is entirely proper, to require those desiring to create a charitable trust by will to do so in terms sufficiently definite so that a court of equity can enforce the same in accordance with the wishes of the testator. This was the law as declared by this Court in the Beggs case.

There is another rule which is applicable here sufficient to condemn the trust upheld by the majority. In Restatement of the Law of Trusts, Section 351, p. 1100, it is said:

"If property is transferred to a person, with no restrictions upon his disposition of the property, a charitable trust is not created merely because the transferor states in the trust in-

strument that he is making the transfer from a motive of promoting charity."

In the instrument now before the Court the corporate trustee or its successor is given explicit authority to select such charitable association and the money to be used as such associations "may deem advisable." This language is clear. There is nothing to construe. It is the settlor's language. The scrivener was her counsel. He chose the language for the settlor. She adopted it by signing and publishing the instrument in accordance with Texas law. This language is broad enough to include any use, whether charitable or not. The Supreme Court of North Carolina, in Woodcock v. Wachovia Bank & Trust Co., 214 N. C. 224, 199 S. E. 20, expressed my view of the law applicable to such a situation. We quote briefly from that case:

"Not only is the purpose of the trust indefinite and uncertain, but the fund is left to the uncontrolled discretion, not of the trustees, but of the trustees' donee, one step further than the curative statute purports to extend."

The majority, under the rule of construction, says that the fund was limited to a charitable use. This is in effect writing a will for the decedent in this case. In the case of City of Haskell v. Ferguson, 66 S. W. (2d) 491, it is said:

"If a court of equity should appoint a trustee and undertake to clothe him with the necessary authority and discretion to carry out the hospital provision of the will, as contended for by the appellants, the practical result would be that the court or the court and trustee would find themselves endeavoring to effectuate the same by mere conjecture on their part as to the testatrix' true intention in the premises. For the court to supply, through a trustee or otherwise, the deficiencies of this provision of the will, would be equivalent to the court's making a last will and testament in that respect for the deceased. Courts have no more authority to make wills for deceased persons than they have to make contracts for those living."

On account of the broad powers expressly given to the trustee by the instrument, and if we assume a general charitable bequest, in my opinion the instrument violates the rule against perpetuities. Paragraph four of the will provides that payments out of the net income shall be made "in such amounts and at such times as my said trustee in its absolute direction may fix." It seems to be the universal rule as, stated by Gray in "The Rule

Against Perpetuities," (3rd ed.) p. 492, that:

"The fact that this may be regarded as a charitable devise does not exempt it from the operation of the Rule (against perpetuities). The Common-Law Rule and our own Statute are without exception. All devises or grants, whether for charitable uses, or otherwise, must vest, if they vest at all, within the time limited. The devise in the present case is vested only in the trustees, and no interest whatever has as yet vested in the party intended to be benefitted."

As stated by this Court in Brooker v. Brooker, 130 Texas 27, 106 S. W. (2d) 247:

"According to our authorities, and also according to the authorities generally, the rule against perpetuities, as contained in the above constitutional provision, is that no interest within its scope is good unless it must vest, if at all, not later than twenty-one years after some life in being at the time of the creation of the interest, and in some instances the period of gestation will be added. (citing authorities) In this connection, it is the settled law that 'if by any possible contingency a devise violates the rule, it cannot stand, and must be held void.' Neely v. Brogden, supra." (239 S. W. 192).

In the present case, the legal title is vested in the trustee. The equitable title is vested in some indefinite donee to be selected by the trustee. The beneficial interest is not to be enjoyed until such times as the trustee in its absolute discretion may fix. Thus it is seen that the trustee, with the broad powers granted to it by the decedent, may postpone the time of selecting the beneficiaries so as to violate the rule against perpetuities. In 69 Corpus Juris, p. 615, the rule is stated:

"An interest which is dependent on the exercise of a power which rests in the uncontrolled discretion of a trustee is contingent, and it is frequently stated that a gift, not directly to the beneficiary, but indirectly through the exercise of powers conferred on trustees, does not vest immediately but is postponed until the power is exercised."

A case directly in point is the case of Girard Trust Co. v. Russell, 179 Fed. 447. In that case the court say:

"If, then, the agreement shows a purpose on the part of McCay to establish a trust for charity, the trust should be sustained, unless it be founded upon conditions that are obnoxious even

to the liberal rule of construction applicable to charitable trusts. That a charity was intended seems clear, for the use declared was the payment of the debt of the state of Pennsylvania; and a gift in trust for the payment of the debt of a state, if not defeated by illegal provisions, is a good charitable gift. (citing authorities).

"The real question in the case is the one adjudicated by the decree of the court below, namely, whether McCay intended that the money deposited by him with the Girard Trust Company on December 18, 1848, should be an absolute, immediate gift for the benefit of the state of Pennsylvania, or whether it should vest in the proposed charity when, and only when it, with its accumulations, should equal the debt of the state. The intent to establish a charity being clear, we should not declare the donor's scheme an illegal one, if we can, under the law, avoid doing so. Indeed, we should look at the agreement with an eye keen to discover reason for sustaining it."

The court declared the trust void because there was no definite time when the state of Pennsylvania would receive the benefits of the trust. The court further stated:

"He did not know, nor could any one know, that that time would ever come. The vesting of the fund in charity was therefore postponed, possibly forever. In such circumstances, have we the power to give effect to the donor's charitable intent?"

To the same effect, see Jocelyn v. Nott, 44 Conn. 55. According to the language of the will, the trustee is directed to select the beneficiary and to pay the income, not annually, immediately, or at some other time, but in the absolute discretion of the corporate trustee or its successor. In other words, there is no enforceable time when the trustee can be compelled to act under the plain language of the will. In the Powers case the funds were to be applied annually.

In my opinion, the will of Mrs. Pyror, when measured by the prior opinion of this Court, should be construed to create a private trust rather than a charitable one. Recurring to the reasoning contained in the opinion of the Beggs case:

"These provisions leave no room for construction. There is not even a remote inference in the will that the donation thereby made was intended as a gift to public charity only. Such a construction would not only find no positive support in the instrument, but would absolutely contradict it. In this connection, it

will be noted that the will never uses the word *public* with the word *charities*. Plainly, this shows that the testator did not intend to compel his executor to give the estate, or any part thereof, to public charity only. It will further be noted that the will never uses the word *private* in connection with the word *charities*. Plainly, this shows that the testator did not compel his executor to give this estate, or any part thereof, to private charity only. The executor was simply given the authority to give the estate to charity,—public or private."

The above opinion, as we have stated, was handed down some three years before the Pryor will was written. The Pryor will was written by a lawyer, presumably with full knowledge of the reasoning contained in the Beggs case. In view of these facts, in my opinion it clearly appears from the language employed in the will of Mrs. Pryor that she wished her trustee or its successor to be permitted within its absolute discretion to apply the income from her estate, not to public charity exclusively, but to any charity, public or private, which her trustee might select. In such a case the trust is a private one and should not be upheld as a charitable trust. I therefore enter my dissent to the majority opinion.

Opinion delivered July 10, 1946.